

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICTOF COLUMBIA

**FILED**

JUN 2 7 2014

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Terry Lennette Grant
~~PO Box 21936~~ 226 Wild Horse Rd
Hilton Head Island, South Carolina 29926

             Claimant,

Case: 1:14-cv-01091
Assigned To : Bates, John D.
Assign. Date : 6/27/2014
Description: Pro Se Gen. Civil

**JURY DEMAND**

    vs

Mr. Marvin H. Dukes, III d/b/a Master in Equity
Beaufort County Master In Equity
Post Office Drawer 1228
Beaufort, SC 29901

Ms. Magalie A. Arcure, (SC BAR #78855)
Post Office Box 41489
Charleston, South Carolina 29423

Mr. Andrew M. Wilson, (SC BAR #72553)
Post Office Box 41489
Charleston, South Carolina 29423

Ms. Joanne A. Tonasini Muniz, (SC BAR #100438)
Post Office Box 41489
Charleston, South Carolina 29423

Mr. Demetri 'Jim' K. Koutrakos, (SC BAR #11318)
 P.O. Box 1390
Columbia, SC 29202

**RECEIVED**

JUN 2 7 2014

Clerk, U.S. District and
Bankruptcy Courts

Ms. Elizabeth S. Moore, (SC BAR #69236)
Post Office Box 41489
Charleston, South Carolina 29423

Ms. Teresa D. Van Vlake, (SC BAR #11118)
Post Office Box 41489
Charleston, South Carolina 29423

Ms. Susan S. White, (SC BAR #5453)
Post Office Box 41489
Charleston, South Carolina 29423

Ms. Beverly J. Finkel, (SC BAR #9794)
Post Office Box 41489
Charleston, South Carolina 29423

Mr. Joseph T. Merli, (SC BAR #3943)
Post Office Box 41489
Charleston, South Carolina 29423

Mr. Thomas A. Shook, (SC BAR #68340)
Post Office Box 41489
Charleston, South Carolina 29423

Ms. Ana Silva, d/b/a Paralegal
Post Office Box 41489
Charleston, South Carolina 29423

Mr. Dominique F. Biggers, d/b/a Litigation Paralegal
Post Office Box 41489
Charleston, South Carolina 29423

Ms. Kara De Young, d/b/a Litigation Paralegal
Post Office Box 41489
Charleston, South Carolina 29423

Ms. Katherine Klaiber, d/b/a Legal Assistant
Post Office Box 41489

Charleston, South Carolina 29423


Ms. Kathleen S. Romero, Employee
1812 Lincoln St.
Post Office Box 1390
Columbia, South Carolina 29202

Ms. Lauren Luviano, d/b/a Paralegal
Post Office Box 41489
Charleston, South Carolina 29423

Mr. Matthew Owens, d/b/a Contract Management Coordinator
Ocwe Loan Servicing, LLC
1661 Worthington Rd. Suite 100
West Palm Beach, Florida 33409

Mr. Gary Kubic, d/b/a County Administrator, Beaufort County, S.C.
PO Box 1228
Beaufort, South Carolina 29901

Mr. Dale L. Butts, d/b/a Registrar of Deeds, Beaufort County, S.C.
PO Box 1228
Beaufort, South Carolina 29901

SC BAR CARD Number 78855
Post Office Box 41489
Charleston, South Carolina 29423

SC BAR CARD Number 72553
Post Office Box 41489
Charleston, South Carolina 29423

SC BAR CARD Number 11318
P.O. Box 1390
Columbia, SC 29202

SC BAR CARD Number 100438
Finkel Law Firm LLC
4000 Faber Place Drive, Suite 450
North Charleston, 29405
South Carolina, USA


SC BAR CARD Number 69236
Post Office Box 41489
Charleston, South Carolina 29423

SC BAR CARD Number 11118
Post Office Box 41489
Charleston, South Carolina 29423

SC BAR CARD Number 3943
Post Office Box 41489
Charleston, South Carolina 29423

SC BAR CARD Number 5453
Post Office Box 41489
Charleston, South Carolina 29423

SC BAR CARD Number 9794
Post Office Box 41489
Charleston, South Carolina 29423

SC BAR CARD Number 68340
Post Office Box 41489
Charleston, South Carolina 29423


Deutsche Bank National Trust Company, as
Trustee for NovaStar Mortgage Funding Trust,
Series 2006-5
c/o Ocwen Loan Servicing LLC
Attn: Customer Care Center
`

PO Box 785057
Orlando, FL 32878-5057

NovaStar Mortgage Funding Trust,
C/O Finkel Law Firm, LLC
Post Office Box 41489
Charleston, South Carolina 29423

GreenPoint Mortgage Funding, Inc.,
C/O Finkel Law Firm, LLC
Post Office Box 41489
Charleston, South Carolina 29423

Mortgage Electronics Registration Services
P.O. Box 2026
Flint, MI 48501-2026
                    Respondent(s)

Claim of Fraud, Fraudulent Deceit, Fraudulent Foreclosure, Conspiracy to

Deprive, Non-Lawful Theft of Property for Personal Gain

COMES NOW, :terry-lennette :grant, an :asiatic-woman (indigenous, on the

land of my ancestors the xi (shee) peoples of the Olmec, Mayan, Aztec, and Inca

Dynasty(s), peaceful habitants on the land prior to the non-lawful, non-provoked

invasion by the barbaric European Nations (Spain, England, France, Portugal,

Italy, Germany, and others, seeking riches on the non-lawful authority of Pope

Alexander VI) hereinafter Claimant, and make this Claim of 'fraud,' 'fraudulent

deceit,' 'fraudulent foreclosure,' 'conspiracy to deprive,' (by members of two law firms and the Master in Equity for personal gains), and the non-lawful theft of property, as follows;

1.

Claim of 'Intentional Fraud' by Mr. Marvin H. Dukes, III d/b/a Master in Equity in the Court of Common Pleas for Beaufort County South Carolina

A Claim for Foreclosure was filed with the Clerk of the Court of Common Pleas for Beaufort County South Carolina (hereinafter 'Clerk') by a member of the Finkel Law Firm, LLC, in 2009.  The Claim was made in the name of Deutsche Bank National Trust Company as Trustee for NovaStar Mortgage Funding Trust Series 2006-5 for an alleged default on a loan.  A search of the record of the

Registrar of Deeds produced an Affidavit of Lost Mortgage/Satisfaction of Lost

Mortgage, filed under penalty of perjury by a Vice President of Mortgage

Electronic Registration Services, Inc., on October 2, 2006.  Once this information

was entered into the record of the Court by the alleged Defendant/Claimant, rather

than Dismiss or Vacate the Claim as a matter of law, Mr. Marvin H. Dukes, III,

d/b/a Master in Equity, allowed fellow BAR members to withdraw their Claim, to

be re-filed at a later date.   These documents, once entered into the record of the

Court, made the Claim by the Finkel Law Firm, on behalf of Deutsche Bank

National Trust Company, invalid, because it took away the 'standing to sue' rule

and the Court of Common Pleas of Beaufort County South Carolina lost its

authority/jurisdiction to hear and/or adjudicate the merits of the dispute.  "If a

Plaintiff lacks standing, then courts, all courts, are legally/constitutionally

incapable of proceeding because; 'courts only adjudicate justiciable

controversies.'

The UNITED STATES DISTRICT COURT FOR THE DISTRICT OF

COLUMBIA, has jurisdiction within 28 U.S.C. 1331 to adjudicate these claims of

Fraud on the Court by Officers of the Court, by persons claiming to be officers

and/or agents of government.

2.

Claim of Intentional Fraud by members of the Finkel Law Firm, LLC and the

Callison Tighe and Robinson, LLC

The members of the Finkel Law Firm, LLC (Magalie A. Arcure, (SC BAR

#78855), Andrew M. Wilson (SC BAR #72553), Joanne A. Tonasini-Muniz (SC

BAR #100438), Beverly J. Finkel, (SC BAR #9794), Elizabeth S. Moore, (SC

BAR #69236), Susan S. White, (SC BAR #5453), Teresa D. Van Vlake, (SC BAR

#11118), Joseph T. Merli, (SC BAR #3943), Thomas A. Shook, (SC BAR

#68340), Katherine Klaiber, Legal Assistant, Ana Silva, Paralegal, Lauren

Luviano, Paralegal, Kara De Young, Litigation Paralegal, and Dominque F.

Biggers, Litigation Paralegal, and the members of Callison, Tighe, and Robinson,

LLC, Demetri 'Jim' K. Koutrakas, (SC BAR #11318), and Kathleen S. Romero,

Employee, has refused to accept/review documents entered into the record of the

Court by the alleged Defendant.   "In essence the question of 'standing' is whether

the litigant is entitled to have the court decide the merits of the dispute or of

,

particular issues."

There was never any part of the Claim in the Court that identifies Deutsche Bank

National Trust Company as the 'holder in due course' or that Deutsche Bank

National Trust Company has both the 'original' note and 'mortgage/security deed

for forensic review by the Court.  The Claim by the above named alleged agents of

Deutsche Bank National Trust Company has failed to show that both the 'original'

note and mortgage/security deed was entered into the record of the Beaufort

County Registrar of Deeds to establish the right of Deutsche Bank National Trust

Company to foreclose.   It is apparent that the above named law firms in filing

this action, and the Master in Equity is using the Court for personal gain to allow

Land Development Company to purchase a property valued at One Million, Two

Hundred and Twenty Thousand Dollars for the price of a foreclosure, even though

the dwelling never had a mortgage against it, and the law firms and the Master in

Equity knows it, all actions by the Attorneys to include the dwelling in the allege

foreclosure and the eventual sale is 'Fraud on the Court by a Court Officer.'

3.

The haste in which the two law firms and the Master in Equity went to grant

a land Development Company the right to buy parcels for a land development that

it did not own, has failed to establish jurisdiction, 'standing to sue,' and owner/

holder of the 'original' note and mortgage/security deed.  In order for a plaintiff to

foreclose, it **must** be established on the record of the Court, that said plaintiff **owns**

both the **'original' note and the mortgage/security deed** at the time of the

filing.  Plaintiffs' Complaint has failed to establish this criteria.  Further, there is

no establishment of **standing to sue** on the part of Deutsche Bank National Trust

Company, nor is there an establishment of the **jurisdiction** of the Court of

Common Pleas for Beaufort County South Carolina to be able to adjudicate the

action brought by the two law firms. To this date, none of the things mentioned

above has been established on the record of the Court of Common Pleas for

Beaufort County South Carolina, yet the Master in Equity has joined forces with

the two law firms to grant a Development Company the right to steal this valuable

property for penny's on the dollar.

4.

The Complainant herein Challenges the Prudential Standing of the Finkel Law

Firm to bring this Claim and the Validity of the Assignment of Mortgage

document of December 10, 2009, attempting to establish an Assignment of

Mortgage on September 26, 2006 to NovaStar Mortgage Funding Trust Series

2006-5, there was never an Assignment from Green Point Mortgage Funding, Inc.,

to NovaStar Mortgage Funding Trust by Mortgage Electronic Registration Services

to establish any protocol and/or chain of custody of title (documents).   There is no

'original' note and mortgage/security deed anywhere in the record of the Court of

Common Pleas for Beaufort County South Carolina that can establish a valid loan

to :terry-lennette :grant.   Complainant/Defendant ask that the 'original' loan

documents be made a part of the Court record for review.

5.

Claim of Intentional Fraud by the Officers of the Court of Common Pleas for

Beaufort County South Carolina

All documents filed as exhibit by the alleged Defendant has been ignored by

the Master in Equity of the Court and the attorneys of the Finkel Law Firm LLC

and the Callison Tighe and Robinson LLC as babbling.  Listed herein is the

documents as listed in the record of the Registrar of Deeds that shows that there is

no lawful mortgage owed by the alleged Defendant to Novastar Mortgage Funding

or any other alleged lender.  The Order of May 28, 2014 is a fraud by the Master in

Equity for the following points; (1) the Order of the Master in Equity includes the

home of the alleged defendant and the home was never part of the loan, document

in Book 01885, Page 1130 explains that only the tract of land containing 3.95

acre's was used, (2) also in Book 1942, Page 2546 it only speaks of a tract of land

3.95 acres in respect to a loan, not the home of the alleged Defendant, (3) the

Easement to the land was sold to Palmetto Electric Cooperative, Inc., Book 01474,

Page 0448 on 09/20/2001 and the alleged Defendant was granted ingress, egress,

and access for both automobile and pedestrian, upon the easement as necessary to

do her business. The Order granting sale of easement as needed by a Development

Company is without authority of any law, statute within South Carolina as this

alleged Defendant has no interest and/or ownership of said easement.

6.

In Book 02456, Page 1986 – 1987, a Satisfaction of Lost Mortgage and an

Affidavit of Lost Mortgage was filed (dated Oct.10, 2006) stating under penalty

of perjury that the mortgage was satisfied, (the undersigned, being the owner and

holder of the above described mortgage, acknowledges that the debt which was

secured thereby has been paid in full and the lien of the mortgage is satisfied and

cancelled October 2, 2006 – Linda Story-Daw, Vice-President for Mortgage

Electronic Registration Systems, Inc., as nominee for Green Point Mortgage

Funding, Inc.), then on the bottom half of the document it stated – under penalty

of perjury, the designated Owner/Holder is the bonafied owner and holder of the

described mortgage; that the original mortgage has been lost and cannot be found;

that the mortgage has not been assigned, hypothecated, or disposed of otherwise –

Linda Story-Daw, Vice-President for Mortgage Electronic Registration Systems,

Inc., October 2, 2006, recorded in the Office of the Registrar of Deeds for Beaufort

County South Carolina on October 10, 2006 in Book 02456 on Page 1986 – 1987

@ File #2006081835 – Received by B Bing – Receipt #448663.  It is the belief of

ter16

the Complainant that this document shows that the debt that was established by this

mortgage is now cancelled, paid off, and that by some administrative error, was

lost.  When this document was entered into the record of the Court of Common

Pleas for Beaufort County South Carolina, Attorneys for the alleged Plaintiff was

taken by surprise.  Then the Complaint was removed from the Court's calendar by

a Notice of Dismissal submitted February 10, 2010 by a Ms. Katherine Klaiber, a

Legal Assistant of the Finkel Law Firm, and it was thought at that time that the

matter was settled, because there was no other document on file for the 2006 time

frame.

7.

In April 2010, a new Claim was filed using the same information, and a so

called Assignment of Mortgage, dated December 2, 2009, that was supposed to

identify an alleged loan signed on September 18, 2006 that was not in the record

earlier in the year.   The Complainant was served with a new Claim for

foreclosure, and this time, there was an alleged Assignment of Mortgage document

that referenced an assignment, transfer from Mortgage Electronic Registration

Systems, Inc., to Deutsche Bank National Trust Company, as Trustee for NovaStar

Mortgage Funding Trust, Series 2006-5, stating that the transfer/assignment was

made on September 18, 2006 allegedly recorded on September 26, 2006 in Book

2448, Page 823, however, it was delivered December 2, 2009 and recorded in

Book 02915, Page 0902 on December 10, 2009.  The document was signed by a

notary that was under investigation as a robo-signer through 2011(Shoua Moua as

an alleged notary in Minnesota and a number of other positions).   Shortly there-

after, the  Finkel Law Firm, LLC introduced  an Adjustable Rate Note allegedly

signed by the Complainant on September 18, 2006, but has no registration to the

Registrar on it.  On page 5 of the Adjustable Rate Note, the signature was forged.

Whomever did the signature, signed  :terry with an i.  This note was brought in by

the attorneys of the Finkel Law Firm, LLC.  When the Complainant yelled that

there is no i in :terry, the document was taken back and at the next hearing another

Mortgage for September 18, 2006 was introduced with no Loan Number attached,

and no registration book and/or page number given.

8.

These documents, entered into the record of the Court by the attorneys of the

Finkel Law Firm, LLC establishes a pattern using documents that can't identify the

party(s) in interest, that does not establish subject matter jurisdiction, that cannot

establish that a mortgage was signed by the Complainant.   Documents have been

used that has more than one signer, documents were used that grant more property

than was used for the original loan, and shows that the Officers of the Court is

using the Court system for personal gain.  Finkel Law Firm, LLC advertised the

property for sale in November 2013, prior to any judgement in the Case.

There is no signed loan agreement that was entered into the record of the Court

that has a valid signature of the true property owner.  :terry-lennette :grant does not

own the property in question and this entire transaction has been done with the

wrong party to the property, as :carolyn :grant is recorded in the record of the

`

Registrar of Deeds in Book 01977, Pages 0727 - 0734 on June 24, 2004 with a

'Durable General Power of Attorney to conduct all business in her stead.  Any

documents signed after June 24, 2004 by :terry-lennette :grant is without authority

of law.

9.

On June 7, 2013, Mr. Gary Kubic, Beaufort County Administrator and Mr.

Dale L. Butts, Registrar of Deeds for Beaufort County filed a lawsuit against

Fourteen (14) Defendants, including Mortgage Electronic Registration Systems,

Inc., (MERS) for its 'fraudulent' business practices and of the MERS Members,

and is allowing this Court to attempt an action of foreclosure using MERS'

documents.    The suit contends that the MERS system has created massive

confusion as to the true owners of beneficial interests in mortgage loans and

mortgages throughout the United States, including South Carolina, and has harmed

U.S. counties, including Plaintiff Beaufort County.  In short, the MERS System has

eroded the transparency and corrupted the chain of title of the public recording

system in the United States the State of South Carolina.  And yet, the Court of

Common Pleas for Beaufort County South Carolina is using this same system to

steal this property using MERS System recordings.   This Case (2013-CP-07-1340)

was filed in the Court of Common Pleas Fourteenth Judicial Circuit.


PRAYER OF THE COMPLAINANT:

It is the Prayer of this Complainant that the United States District Court for the

District of Columbia examine the this Case (2010-CP-07-1690), and the above

referenced Case of Beaufort County and Reverse any and all Rulings, Judgements,

and Orders of Mr. Marvin H. Dukes, III d/b/a Master in Equity, for his role in the

Fraud on the Court of Common Pleas for Beaufort County, South Carolina.

The Complainant ask the United States District Court for the District of Columbia

for Compensation for the frustration, pain, suffering, humiliation, and expenses of

defending a case that was proven to be null and void in 2009.


Further Complainant Saith Not!


Respectfully submitted this 27 of _____June_____, 2014


_____, :asiatic woman

:terry-lennette :grant

OMB NO. 2502-0265

| A. | | B. | OF LOAN: | | | | |
|---|---|---|---|---|---|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | | 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ CONV. UNINS. | 4. ☐ VA | 5. ☐ CONV. INS. | |
| SETTLEMENT STATEMENT | | 6. FILE NUMBER: 60385C-06 | | | 7. LOAN NUMBER: 06-A19021 | | |
| | | 8. MORTGAGE INS CASE NUMBER: | | | | | |

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*
10   3/06   [GRANT.T728 PFD/60385C-06/11]

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| Terry Lennette Giant 226 Wild Horse Road Hilton Head Island, SC 29926 | | Novastar Mortgage. Inc 4059 Kinrose Lakes Parkway #200 Richfield. OH 44286 |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT:   20-4567849 | I. SETTLEMENT DATE: |
|---|---|---|
| 226 Wild Horse Road Hilton Head Island, SC 29926 Beaufort County, South Carolina | Wolf & Mogil, LLC | September 18, 2006 |
| | PLACE OF SETTLEMENT | Disburse:09/22/06 |
| | 94 Main Street, Suite C-102 Hilton Head Island, SC 29926 | |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER: | | 400. GROSS AMOUNT DUE TO SELLER: | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 156,029.96 | 403. | |
| 104. Payoff first mortgage to Green Point Mortgage | 387,910.25 | 404. | |
| 105. Payoff second mortgage to South Carolina Bank and | 101,768.42 | 405. | |
| Adjustments For Items Paid By Seller in advance | | Adjustments For Items Paid By Seller in advance | |
| 106. PR Taxes                     to | | 406. PR Taxes                     to | |
| 107. County Taxes              to | | 407. County Taxes              to | |
| 108. Assessments              to | | 408. Assessments              to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 645,708.63 | 420. GROSS AMOUNT DUE TO SELLER | |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER: | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER: | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 680,000.00 | 502. Settlement Charges to Seller (Line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first Mortgage | |
| 205. | | 505. Payoff of second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments For Items Unpaid By Seller | | Adjustments For Items Unpaid By Seller | |
| 210. PR Taxes                     to | | 510. PR Taxes                     to | |
| 211. County Taxes              to | | 511. County Taxes              to | |
| 212. Assessments              to | | 512. Assessments              to | |
| 213. | | 513. | |
| 214. | | 514.   I HEREBY CERTIFY THIS TO BE A | |
| 215. | | 515.   TRUE & CORRECT COPY OF THE ORIGINAL | |
| 216. | | 516. | |
| 217. | | 517.   BY: | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY/FOR BORROWER | 680,000.00 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER: | | 600. CASH AT SETTLEMENT TO/FROM SELLER: | |
| 301. Gross Amount Due From Borrower (Line 120) | 645,708.63 | 601. Gross Amount Due To Seller (Line 420) | |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 680,000.00 ) | 602. Less Reductions Due Seller (Line 520) | ( ) |
| 303. CASH ( ☐ FROM ) ( ☒ TO ) BORROWER | 34,291.37 | 603. CASH ( ☐ TO ) ( ☐ FROM ) SELLER | 0.00 |

*By signing page 2 of this statement, the signatories acknowledge receipt of a completed copy of page 1 of this two page page statement*


PLAINTIFF'S
EXHIBIT
1 wolf
10/10/13     KPB

693

**STATE OF SOUTH CAROLINA**      )
                                 )                **EASEMENT**
**COUNTY OF BEAUFORT**           )

        **KNOW ALL MEN BY THESE PRESENTS** that the undersigned _____ _TERRY L. GRAN)_ _____ (hereinafter "**GRANTOR**"), for good and valuable consideration, and One ($1.00) Dollar, the receipt and sufficiency of which is hereby acknowledged, and in further consideration of the covenants and conditions expressed herein, do hereby grant bargain and sell by these presents have granted, bargained and sold unto **PALMETTO ELECTRIC COOPERATIVE, INC.**, its Successors and Assigns (hereinafter "**GRANTEE**") the nonexclusive right to enter the following described lands for the purpose of erecting, operating and maintaining an overhead and/or underground electrical generation and distribution system.

**ALL** that certain piece, parcel or lot of land described and known as:

| | |
|---|---|
| **NUMBER OF ACRES:** | 3.68 |
| **TAX DISTRICT:** | 5/0 |
| **MAP & PARCEL NO.:** | R510-007-000-018 A |
| **AREA OF COUNTY:** | |
| **TOWN/TOWNSHIP:** | HILTON HEAD ISLAND. |
| **PLANTATION/SUBDIVISION:** | |
| **LOT:** | |
| **PLAT REFERENCE:** | Book: 1091    Page: 1851 |
| **OTHER:** | |

Said easement being ___five (5')___ feet on either side of centerline of power line.

        **TOGETHER** with all and singular, the Rights, Members, Hereditaments and Appurtenances to the said Premises belonging, or in any wise incident or appertaining.

        **TO HAVE AND TO HOLD,** all and singular, the said Premises before mentioned unto the **PALMETTO ELECTRIC COOPERATIVE, INC.**, its Successors and Assigns forever.

BEAUFORT COUNTY SC - ROD
**BK 01474 PG 0448**
**FILE NUM 2001058315**
RECORDING FEES 10.00
RECORDED BY S FRAZIER RCPT# 19787
RECORDED 09/20/2001   01:04:49 PM

Without in any way limiting, or being limited by, the foregoing, my said Attorney-in-Fact is fully authorized to:

1.  prepare and execute tax returns and similar returns on my behalf and pay any taxes which are determined to be due; and

2.  represent me before any office of the Internal Revenue Service or any other tax authority with respect to any and all tax matters in any and all years or periods; receive confidential information and have full power to perform, on my behalf, all acts necessary to resolve any matter raised by the Internal Revenue Service or other tax authorities; delegate authority or substitute another representative; and

3.  enter into any safe deposit box in my own name, to remove anything therefrom or to place anything therein; and

4.  deposit funds in and withdraw funds from any bank account, money market account, or investment fund in my name, and to endorse any check or similar instrument constituting monies payable to me; and

5.  pay from funds in my name all expenses and charges which I incur or which are incurred for my benefit; and

6.  execute any document in my name for the purpose of conveying title or an interest therein or otherwise exercising any authority granted hereunder; and

7.  make gifts (including personal property of mine) to any spouse, child or grandchild of mine (including the donee of this power) consistent with my previous practice, giving due consideration to my financial needs.

GIVING AND GRANTING unto my said Attorney-in-Fact full power and authority to do and to perform all and every deed, act and thing whatsoever, in my name, place and stead, as fully and effectively for all intents and purposes as I might or could do in my own person if personally present, and I hereby ratify and confirm all that my said Attorney-in-Fact shall lawfully do or cause to be done by virtue of these Presents.

I HEREBY DECLARE that any deed, act or thing lawfully done hereunder, and any document executed pursuant hereto, by my said Attorney-in-Fact shall be binding upon myself and my heirs, legal and personal representatives and assigns. All property and interests in property titled in my name are subject to this Durable General Power of Attorney. Further, the powers conferred upon my Attorney-in-Fact hereunder shall extend to all property in which I have an interest jointly with any other person.

### SPECIAL PROVISIONS

1.  <u>My Attorney-in-Fact's General Powers Regarding My Health Care:</u> My Attorney-in-Fact is authorized in my Attorney-in-Fact's sole and absolute discretion to exercise the powers granted herein relating to matters involving my health and medical care. In exercising such powers, my Attorney-in-Fact should first try to discuss with me the specifics of any proposed decision regarding my medical care and treatment if

2

I am able to communicate in any manner, however rudimentary. My Attorney-in-Fact is further instructed that if I am unable to give an informed consent to a proposed medical treatment, my Attorney-in-Fact shall give, withhold or withdraw such consent for me based upon any treatment choices that I have expressed while competent, whether under this document or otherwise.   If my Attorney-in-Fact cannot determine the treatment choice I would want made under the circumstances, then my Attorney-in-Fact should make such a choice for me based upon what my Attorney-in-Fact believes to be in my best interest. Accordingly, my Attorney-in-Fact is authorized as follows:

a.    Gain Access to Medical Records and Other Personal Information.   To request, receive and review any information, verbal or written regarding my personal affairs or my physical or mental health, including medical or hospital records, and to execute any releases or other documents that may be required in order to obtain such information, and to disclose such information to such persons or entities, as my Attorney-in-Fact shall deem appropriate. If I am incompetent at the time my Attorney-in-Fact shall request such information, all persons are authorized to treat any such request for information by my Attorney-in-Fact as the request of my legal representative and to honor such request on that basis. In connection therewith, I hereby waive all privileges which may be applicable to such information and records and to any communication pertaining to me and made in the course of any confidential relationship recognized by law.

b.    Employ and Discharge Health Care Personnel.   To employ and discharge medical personnel including physicians, psychiatrists, dentists, nurses, and therapists as my Attorney-in-Fact shall deem necessary for my physical, mental and/or emotional well-being, and to pay them (or cause to be paid to them) reasonable compensation.

c.    Give, Withhold or Withdraw Consent to Medical Treatment.   To give or withhold consent to any medical procedure, test or treatment, including surgery; to arrange for my hospitalization, convalescent care, hospice or home care; to summon paramedics or other emergency medical personnel and seek emergency treatment for me, as my Attorney-in-Fact shall deem appropriate; and under circumstances in which my Attorney-in-Fact determines that certain medical procedures, tests, or treatments are no longer of any benefit to me or, where the benefits are outweighed by the burdens imposed, to revoke, withdraw, modify or change consent to such procedures, tests, and treatments as well as hospitalization, convalescent care, hospice or home care which I or my Attorney-in-Fact may have previously allowed or consented to or which may have been implied due to emergency conditions. My Attorney-in-Fact's decisions should be guided by taking into account (1) the provisions of this document, (2) any reliable evidence whether available before or after the execution of this document,

3

(3) what my Attorney-in-Fact believes I would want done in the circumstances if I were able to express myself, and (4) any information given to my Attorney-in-Fact by the physicians treating me as to my medical diagnosis and prognosis and the intrusiveness, pain, risks and side effects associated with the treatment.

d.    **Exercise and Protect My Rights.** To exercise my right of privacy and my right to make decisions regarding my medical treatment even though the exercise of my rights might hasten my death or be against conventional medical advice.

e.    **Authorize Relief From Pain.**  To consent to and arrange for the administration of pain-relieving drugs of any kind or other surgical or medical procedures calculated to relieve my pain, including unconventional pain-relief therapies which my Attorney-in-Fact believes may be helpful, even though such drugs or procedures may lead to permanent physical damage or addiction or hasten the moment of (but not intentionally cause) my death.

f.    **Grant Releases.** To grant, in conjunction with any instructions given under this Article, releases to hospital staff, physicians, nurses and other medical and hospital administrative personnel who act in reliance on instructions given by my Attorney-in-Fact or who render written opinions to my Attorney-in-Fact in connection with any matter described in this section from all liability for damages suffered or to be suffered by me; to sign documents entitled or purporting to be a "Refusal of Treatment" and "Leaving Hospital Against Medical Advice" as well as any necessary waivers of or releases from liability required by a hospital or physician to implement my wishes or my Attorney-in-Fact's decisions regarding medical treatment or non-treatment.

2.    **My Attorney-in-Fact's Powers Regarding the Care and Control of My Body.** My Attorney-in-Fact is authorized as follows with respect to the care and control of my body:

a.    **Provide For My Residence.** To make all necessary arrangements for me at any hospice, rehabilitation center, long term care center, nursing home, convalescent home or similar establishment and to assure that all my essential needs are provided for at such facility.

b.    **Make Advance Funeral Arrangements.** To make advance arrangement for my funeral and burial, including the purchase of a burial plot and marker, and such other related arrangements as my Attorney-in-Fact shall deem appropriate, if I have not already done so myself.

c.    **Provide for Companionship.** To provide for such companionship for me as will meet my needs and preferences at a time when I am disabled or otherwise unable to arrange for such companionship myself.

4

3.   Third Party Reliance.  For the purpose of inducing any individual, organization, or entity (including but not limited to any physician, hospital, rehabilitation center, long term care center, nursing home, insurer, or other party, all of whom will be referred to in this Section as a "person") to act in accordance with the instructions of my Attorney-in-Fact as authorized in this document, I hereby represent, warrant and agree that:

   a.   Reliance on Attorney-in-Fact's Authority and Representation.  No person who relies in good faith upon the authority of my Attorney-in-Fact under this document shall incur any liability to me, my estate, my heirs, successors or assigns.   In addition, no person who relies in good faith upon any representation my Attorney-in-Fact may make as to (a) the fact that my Attorney-in-Fact's powers are in effect, (b) the scope of my Attorney-in-Fact's authority granted under this document, (c) my competence at the time this document is executed, (d) the fact that this document has not been revoked, or (e) the fact that my Attorney-in-Fact continues to serve as my Attorney-in-Fact, shall incur any liability to me, my estate, my heirs, successors or assigns for permitting my Attorney-in-Fact to exercise any such authority.

   b.   No Liability for Unknown Revocation or Amendment.  If this document is revoked or amended for any reason, I, my estate, my heirs, successors and assigns will hold any person harmless from any loss suffered or liability incurred as a result of such person acting in good faith upon the instructions of my Attorney-in-Fact prior to the receipt of such person of actual notice of such revocation or amendment.   A publically recorded document shall constitute delivery of actual notice with respect to the purchase, sale, or encumbrancing of real property.

   c.   Resort to Courts.  I hereby authorize my Attorney-in-Fact to seek on my behalf and at my expense:

      i.   A declaratory judgement from any court of competent jurisdiction interpreting the validity of this document or any of the acts authorized by this document, but such declaratory judgement shall not be necessary in order for my Attorney-in-Fact to perform any act authorized by this document; or

      ii.   A mandatory injunction requiring compliance with my Attorney-in-Fact's instructions by any person obligated to comply with instructions given by my Attorney-in-Fact; or

      iii.   Actual and punitive damages against any person obligated to comply with instructions given by my Attorney-in-Fact who negligently or wilfully fails or refuses to follow such instructions.

4.   Reimbursement of Costs.  My Attorney-in-Fact shall be entitled to reimbursement for all reasonable costs and expenses actually incurred and paid by my Attorney-in-

Fact on my behalf under any provision of this document, but my Attorney-in-Fact shall not be entitled to compensation for services rendered hereunder.

5.     Resignation of Attorney-in-Fact. My Attorney-in-Fact and any alternate Attorney-in-Fact may resign by the execution of a written resignation, witnessed and executed in recordable form (under South Carolina law), delivered to me or, if I am mentally incapacitated, delivered to my legal guardian or conservator, and absent such person then to any person with whom I am residing or who has the care and custody of me, or, in the case of the resignation of an alternate, by delivery to my primary Attorney-in-Fact. In the event that my said Attorney-in-Fact resigns, is unable to continue, or declines to accept this position, I hereby nominate, constitute and appoint, **ANTHONY GRANT**, as my successor or alternate Attorneys-in-Fact. In the event that **ANTHONY GRANT** resigns, is unable to continue or declines this position, I hereby nominate, constitute and appoint **LILLIAN FLAKES**, as my successor or alternate Attorney-in-Fact.

6.     Photocopies. My Attorney-in-Fact is authorized to make photocopies of this document as frequently and in such quantity as my Attorney-in-Fact shall deem appropriate. All photocopies, certified as True Copies by a Notary Public, or comparable public official, shall have the same force and effect as the original. I specifically direct my Attorney-in-Fact to have a photocopy of this document placed in my medical records if such a copy does not already constitute a part of my medical records.

7.     Exculpation and Indemnity. My Attorney-in-Fact and my Attorney-in-Fact's estate, heirs, successors and assigns are hereby released and forever discharged by me, my estate, my heirs, successors and assigns from all liability and from all claims or demands of all kinds arising out of the acts or omissions of my Attorney-in-Fact, except for willful misconduct or gross negligence. I, for myself and for my Estate, heirs, successors and assigns, hereby agree to indemnify and hold my Attorney-in-Fact, and the Estate, heirs, successors and assigns thereof, harmless from any and all claims whatsoever made by any third person whom soever which arises out of the exercise of this Power of Attorney, including reasonable attorney fees and Court costs incurred by my Attorney-in-Fact, or the Estate, heirs, successors and assigns, thereof, provided such exercise was undertaken in good faith and for my best interest.

8.     Term. The Power of Attorney expressed herein shall continue indefinitely at the pleasure of the Principal and may be terminated by the principal at any time, without cause.

9.     Incompetency. This Power of Attorney, and the authority of my Attorney-in-Fact to exercise the powers herein conferred, shall not be affected by physical disability or

6

mental incompetence which I may hereafter suffer which renders me incapable of managing my own estate. In the event that any power herein shall be declared illegal, unenforceable or otherwise void by any Court, all remaining powers and authority granted herein shall remain in full force and effect.

10.   Governing Law. This document shall be governed by the laws of the State of South Carolina in all respects, including its validity, construction, interpretation, and termination. I intend for this Durable General Power of Attorney with Health Care Provisions to be honored in any jurisdiction where it may be presented and for any such jurisdiction to refer to South Carolina law to interpret and determine the validity of this document and any of the powers granted under this document.

11.   Effective Date. Except with respect to the right to record this instrument set forth below, which shall become effective upon execution hereof, this Instrument shall become effective upon the date that the same is recorded in the appropriate public records of Beaufort County, South Carolina, and shall remain effective until a Termination of Power of Attorney, or a new Power of Attorney declaring all previous General Powers of Attorney void, validly executed by me, shall be recorded likewise. Any act that is done under this Power of Attorney between the date of revocation of this Instrument and the date that notice of such revocation is received by my Attorney-in-Fact shall be valid unless the person claiming the benefit of the act had notice of such revocation. In the event that this Instrument is not recorded at the time that I am determined to be incompetent by reason of physical disability or mental incompetence, my designated Attorney-in-Fact is authorized to record this Instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and seal in the presence of witnesses this date, _June   23_____, 2000. 2004 2 JH

SIGNED, SEALED AND DELIVERED IN
THE PRESENCE OF:

Michele L C_____
Witness

_____
Witness

Principal: _____
**TERRY LENNETTE GRANT**

7

STATE OF SOUTH CAROLINA    )

COUNTY OF BEAUFORT           )

ACKNOWLEDGMENT
(under SC Code §30-5-30 (C))

I, the undersigned Notary Public, do hereby certify that **TERRY LENNETTE GRANT** the above Principal personally appeared before me this _23_ day of _June_ _2004_, ~~2000~~, and acknowledged the due execution of the foregoing instrument.

_Michelle L C____

Notary Public for South Carolina

My Commission Expires: _2/21/05_


STATE OF SOUTH CAROLINA    )

                           )

COUNTY OF BEAUFORT           )

**ATTESTATION PROVISION**

This instrument of 8 typewritten pages, this page included, was signed, sealed, published and declared by **TERRY LENNETTE GRANT**, Principal, as and for her Durable General Power of Attorney in our presence who, at her request and in her presence and in the presence of each other, have hereunto subscribed our names as attesting witnesses, and we verily believe said Principal to be of sound mind and memory on the date hereof.

_Michelle L C____ residing at _Bluffton, SC 2990_

_Peter J L M_ residing at _Hilton Head Island, SC_

C:\My Documents\Peter clients\PLANNING\Grant\DPOA.wpd

8

15-843
21
wolf
1674

BEAUFORT COUNTY SC - ROD
BK 01885 PGS 1116-1130
FILE NUM 2003098284
12/16/2003 08:47:41 AM
REC'D BY S FSMITH RCPT# 206253
RECORDING FEES 21.00

After recording please return to:

**GreenPoint Mortgage Funding, Inc.**
*[Company Name]*

*[Name of Natural Person]*

**33 San Pablo Avenue**
*[Street Address]*

**San Rafael, CA 94903**
*[City, State  Zip Code]*

_____ *[Space Above This Line For Recording Data]* _____

# MORTGAGE

MIN 100013800829240361

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**     **"Security Instrument"** means this document, which is dated **December 08, 2003**, together with all Riders to this document.

  **(B)**     **"Borrower"** is **Terry Lennette Grant**

. Borrower is the mortgagor under this Security Instrument.

**(C)**     **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

  **(D)**     **"Lender"** is **GreenPoint Mortgage Funding, Inc.**

Lender is a **Corporation** organized and existing under the laws of the **State of New York.** Lender's address is **100 Wood Hollow Drive, Novato, CA 94945**

**(E)**     **"Note"** means the promissory note signed by Borrower and dated **December 08, 2003.** The Note states that Borrower owes Lender **Three Hundred Ninety Eight Thousand  and 00/100ths**
Dollars (U.S. **$398,000.00**)



G P M W D  0 0 8 2 9 2 4 0 3 6 1 1 7

OR BK 01885 PAGE 1117

plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **January 01, 2034**.

**(F)**     **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)**     **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)**     **"Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower *[check box as applicable]*:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Revocable Trust Rider | |
| ☐ Other(s) *[specify]* | | |

**(I)**     **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)**     **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)**     **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)**     **"Escrow Items"** means those items that are described in Section 3.

**(M)**     **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)**     **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)**     **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)**     **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security



OR BK 01885 PAGE 1118

Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

| County | of Beaufort | : |
|---|---|---|
| *[Type of Recording Jurisdiction]* | *[Name of Recording Jurisdiction]* | |

**AS MORE PARTICULARLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HERE OF.**

which currently has the address of **226 Wild Horse Road**
*[Street]*

**Hilton Head Island** , South Carolina **29926** ("Property Address"):
*[City]* *[Zip Code]*

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:



OR BK 01885 PAGE 1119

**1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.   Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:  (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.   Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow

Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards



including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

OR BK 01886 PAGE 1122

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously

South Carolina Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      MERS Modified Form 3041 01/01
—THE COMPLIANCE SOURCE, INC.—                                          Page 7 of 14                                    14301SC 08/00
www.compliancesource.com                                                                          ©2000, The Compliance Source, Inc



G P M W D 0 0 8 2 9 2 4 0 3 6 1 1 7

OR BK 01885 PAGE 1123

provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by



OR BK 01885 PAGE 1124

this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.



G P M W D 0 0 8 2 9 2 4 0 3 6 1 1 7

OR BK 01885 PAGE 1125

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

**South Carolina Mortgage**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    MERS Modified Form 3041 01/01
—THE COMPLIANCE SOURCE, INC.—    **Page 10 of 14**    14361SC 08/00
www.compliancesource.com    ©2000, The Compliance Source, Inc



G  P  M  W  D  0  0  8  2  0  2  4  0  3  6  1  1  7

OR BK 01885 PAGE 1126

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances:



gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup .

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence, all of which shall be additional sums secured by this Security Instrument.

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument shall become null and void. Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Homestead Waiver.** Borrower waives all rights of homestead exemption in the Property to the extent allowed by Applicable Law.

**25. Waiver of Appraisal Rights.** The laws of South Carolina provide that in any real estate foreclosure proceeding a defendant against whom a personal judgment is taken or asked may within 30 days after the sale of the mortgaged property apply to the court for an order of appraisal. The statutory appraisal value as approved by the court would be substituted for the high bid and may decrease the amount of any deficiency owing in connection with



the transaction. TO THE EXTENT PERMITTED BY LAW, THE UNDERSIGNED HEREBY WAIVES AND RELINQUISHES THE STATUTORY APPRAISAL RIGHTS WHICH MEANS THE HIGH BID AT THE JUDICIAL FORECLOSURE SALE WILL BE APPLIED TO THE DEBT REGARDLESS OF ANY APPRAISED VALUE OF THE MORTGAGED PROPERTY. This waiver shall not apply so long as the Property is used as a dwelling place as defined in § 12-37-250 of the South Carolina Code of Laws.

    **26. Future Advances.** The lien of this Security Instrument shall secure the existing indebtedness under the Note and any future advances made under this Security Instrument up to one hundred fifty percent (150%) of the original principal amount of the Note plus interest thereon, attorneys' fees and court costs.

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____

Printed Name: _____ *[Please Complete]*

_____

Chantal L. Faquth
Printed Name: _____ *[Please Complete]*

_____ (Seal)
Terry Lennette Grant                -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ *[Space Below for Acknowledgment ]* _____

State of South Carolina      §
     §
County of Beaufort      §

Before me the undersigned authority, on this day personally appeared  Terry Lennette Grant

known to me (or proved to me through an identity card or other document) to be the person(s) whose name is
subscribed to the foregoing instrument, and acknowledged to me that he/she/they executed the same for the purposes
and consideration therein expressed.

Given under my hand and seal on this      8th      day of  December                              , 2003 .

(Seal)

Notary Public   SC
My Commission Expires:    1/31/2010

G P M W D 0 0 8 2 9 2 4 0 3 6 1 1 7

EXHIBIT "A"

ALL that certain piece, parcel or tract of land situate, lying and being on Hilton Head Island, Beaufort County, South Carolina, containing 3.95 acres, more or less, according to a plat of Carl E. Ekholm, RLS, dated November 29, 1969, and bearing number 2047, and having the following metes and bounds: Commencing at concrete marker on the eastern right-of-way of Wild Horse Road, 0.7 mile to the Jct. Of Wild Horse Road with South Carolina Highway 294 and running thence North 0227'20" East for a distance of Two Hundred Eighty Five and five Hundredths (285.05') feet to a concrete marker on the right-of-way border of said Wild Horse Road and running thence South 4704'20" East for a distance of Eight Hundred Seventy Nine and eighteen Hundredths (897.18') feet to a concrete marker on the property line of James Fuller; thence South 4713' West for a distance of Two Hundred Twenty Nine and ten North 4553' West for a distance of Six Hundred Seventy Nine and twenty Hundredths (679.20') feet to a concrete marker to the point of beginning; and being bounded on the Northeast by the lands now or formerly of James Fuller and Clarence Orage on the Southeast by the lands now or Formerly of James Fuller; on the Southwest by the lands now or formerly of David Orage and on the Northwest by State Highway 294 known as Wild Horse Road

This being the same property conveyed to the within Mortgagor(s) by deed dated August 9th, 2001 and recorded in the Office of the Register of Deeds for Beaufort County, South Carolina in Deed Book 1463 at Page 54.

The within Mortgage was prepared in the law office of PETER WOLF & ASSOCIATES, P.C., Post Office Box 5039, Hilton Head Island, South Carolina 29938, by Peter L. Wolf, Esq..



STATE OF SOUTH CAROLINA    )

                             )    PARTIAL RELEASE OF MORTGAGE

COUNTY OF BEAUFORT        )

FOR VALUE RECEIVED, the undersigned does hereby release and forever discharge the following described real property from the lien of that certain Mortgage in favor of the undersigned executed by Terry Lennette Grant dated December 8, 2003 in the principal amount of $398,000.00 and recorded in Mortgage Book 1885 at Page 1116 in the Office of the Register of Deeds for Beaufort County, South Carolina:

Portion of 3.95 acres, Wild Horse Road area
Hilton Head Island, South Carolina
As more particularly described in EXHIBIT "A" hereof

Except as hereinabove provided, the aforesaid Mortgage, and the Promissory Note the payment of which is secured by said Mortgage, shall remain in full force and effect and shall remain binding upon the parties thereto in accordance with the original terms thereof.

IN WITNESS WHEREOF, the undersigned has caused these Presents to be duly executed on this date __APRIL 21,_____ , 2004.

SIGNED, SEALED AND DELIVERED
IN THE PRESENCE OF:

(2)_____

Witness #1     LINDA SAYAMA

(3)_____

Witness #2 (may be Notary)

THERESSA SANKS

GreenPoint Mortgage Funding, Inc.

(1)  BY:_____

Authorized officer

LINDA STORY-DAW, VICE PRESIDENT

BEAUFORT COUNTY SC - ROD
BK 01942 PGS 2544-2546
FILE NUM 2004025836
04/23/2004  09:11:28 AM
REC'D BY V GARVIN RCPT# 238264
RECORDING FEES 8.00

STATE OF _____ GEORGIA _____ )

                                 )          **ACKNOWLEDGMENT**
COUNTY OF ____ MUSCOGEE ____      )          under SC Code: 30-5-30(C)

    I, (4) _____ DONNA D. SIMS _____, a Notary Public, do hereby certify that GreenPoint Mortgage Funding, Inc., by its authorized officer, personally appeared before me this _21_ day of ___ APRIL _____, 2004 and, being known to me personally or having provided adequate evidence of identity, acknowledged the due execution of the foregoing instrument.

(5) _____

Notary Public for:
DONNA D. SIMS

My Commission expires:
3/25/2007

## EXHIBIT "A"

ALL that certain piece, parcel or tract of land situate, lying and being on Hilton Head Island, Beaufort County, South Carolina, containing 3.95 acres, more or less, according to a plat of Carl E. Ekholm, RLS, dated November 29, 1969, and bearing number 2047, and having the following metes and bounds: Commencing at concrete marker on the eastern right-of-way of Wild Horse Road, 0.7 mile to the Jct. Of Wild Horse Road with South Carolina Highway 294 and running thence North 02 27' 20" East for a distance of Two Hundred Eighty Five and five Hundredths (285.05') feet to a concrete marker on the right-of-way border of said Wild Horse Road and running thence South 47 04' 20" East for a distance of Eight Hundred Seventy Nine and eighteen Hundredths (879.18') feet to a concrete marker on the property line of James Fuller; thence South 47 13' West for a distance of Two Hundred Twenty Nine and ten hundreths (229.10') feet to a concrete marker on the border line of James Fuller; thence North 45 53' West for a distance of Six Hundred Seventy Nine and twenty Hundredths (679.20') feet to a concrete marker, to the point of beginning; and being bounded on the Northeast by the lands now or formerly of James Fuller and Clarence Orige; on the Southeast by the lands now or Formerly of James Fuller; on the Southwest by the lands now or formerly of David Orage and on the Northwest by State Highway 294 known as Wild Horse Road

SAVE AND EXCEPT all that certain piece, parcel or lot of land, including improvements thereon, situate, lying and being on Hilton Head Island, County of Beaufort, State of South Carolina, containing .46 acres, more or less, and more particularly described and identified as PARCEL A on that certain plat of Donald R. Cook, Jr., S. C. R. L. S. # 19010, dated September 30, 2003, last revised December 22, 2003, , entitled "A Subdivision Survey of 3.99 Ac., Wild Horse Road", and recorded in the office of the Register of Deeds for Beaufort County, South Carolina in Plat Book 96 at Page 191. For a more detailed description of said property, reference is craved to said recorded Plat.

This being a portion of the property conveyed to Terry Lennette Grant by deed dated August 9, 2001, and recorded in the Office of the Register of Deeds for Beaufort County, South Carolina in Book 1463 at Page 54.

This Partial Release was prepared by the law office of Peter Wolf and Associates, PC, 94 Main Street, Suite C-1023, Hilton Head Island, SC, 29926.

*2*
*EMW(?)*
*GreenPoint*
*8349*

BEAUFORT COUNTY SC - ROD
BK 02456 PGS 1986-1987
FILE NUM 2006081835
10/10/2006  02:19:59 PM
REC'D BY B BING RCPT# 448663
RECORDING FEES 5.00

When Recorded Return To:
GreenPoint Mortgage Funding, Inc.
2300 Brookstone Centre Parkway
Columbus, GA  31904
Prepared By: IRIS QUINONES

### Satisfaction of Lost Mortgage

Loan Number 0082924036
MERS MIN# 10001380082240361

State of South Carolina County of Beaufort ,
Terry Lennette Grant  Mortgagor  to  Mortgage Electronic Registration Systems, Inc  as Nominee of Green
Point Mortgage Funding, Inc.  , Mortgagee  Dated December 08, 2003 in the amount of $398,000.00
recorded in book 01985, page 1116-1130.

Present Owner/Holder: Mortgage Electronic Registration Systems, Inc  as Nominee of Green Point
Mortgage Funding, Inc
The undersigned, being the owner and holder of the above described mortgage, acknowledges that the debt
which was secured thereby has been paid in full and the lien of the mortgage is satisfied and cancelled
October 2, 2006

Mortgage Electronic Registration Systems, Inc. as Nominee of Green Point Mortgage Funding, Inc

By: _____
Linda Story-Daw, Vice President

_____          _____
Cassandra Williams                         Jack Horne III

### PROBATE

Personally appeared before me the undersigned witness, who, being duly sworn, says that he/she saw the
within named Owner/Holder sign, seal and deliver the within Lost Mortgage Satisfaction; and that he/she
with the other witness whose signature appears above, witnessed the execution there

By _____
Cassandra Williams

State of Georgia County of Muscogee
Subscribed and sworn to (or affirmed) before me on October 2, 2006 by Linda Story-Daw, Vice President,
personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who
appeared before me.

_____
Laura E. Harris, Notary Public
My Commission Expires: May 17, 2009

### Affidavit of Lost Mortgage

Personally appeared before me the undersigned witness, who, being duly sworn, says the above designated
Owner/Holder is the bonafied owner and holder of the described mortgage; that the original mortgage has
been lost and cannot be found; that the mortgage has not been assigned, hypothecated or disposed of
otherwise.

Mortgage Electronic Registration Systems, Inc  as Nominee of Green Point Mortgage Funding, Inc.

By _____
Linda Story-Daw, Vice President

State of Georgia County of Muscogee
Subscribed and sworn to (or affirmed) before me on October 2, 2006 by Linda Story-Daw, Vice President,
personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who
appeared before me.

_____
Laura E. Harris, Notary Public
My Commission Expires: May 17, 2009

August 5, 2000 (11 20pm)

STATE OF SOUTH CAROLINA ) **DURABLE GENERAL**

COUNTY OF BEAUFORT ) **POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENT, which are intended to constitute a DURABLE GENERAL POWER OF ATTORNEY, that I **TERRY LENNETTE GRANT**, as Principal, a resident of Hilton Head Island, Beaufort County, South Carolina, hereby intending to revoke any and all General Powers of Attorney heretofore executed by me, have made, constituted and appointed, and by these Presents do make, constitute and appoint my sister, **CAROLYN GRANT**, as my true and lawful Attorney-in-Fact, to act in my name and on my behalf, in my place and stead, in any matter whatsoever involving my financial affairs, personal affairs and medical care, including but not limited to the following:

a.   All matters relating to the financial management of assets, or any interest therein which I now own, or may hereafter acquire, in my own name, real and personal, tangible and intangible, including but not limited to the investment and reinvestment of funds, the purchase, lease and sale of assets (real and personal, tangible and intangible, for cash or with financing), the receipt of income and disbursement of expenses, and the exercise of all rights with respect thereto.

b.   All matters relating to the management, care and preservation of such assets, including the insurance, repair, maintenance and use thereof and the right to convey the same to any Revocable Living Trust of which I am the Grantor and the current income beneficiary.

c.   All matters relating to the continuation of, or participation in, any business or venture in which I am, or hereafter become, a participant in my own name or which I own, or hereafter acquire, in my own name, in whole or in part, directly or through ownership in whole or in part of any entity which undertakes the same, as well as all matters relating to the valuation of any such interest and the sale or termination of any such business or venture or the dissolution of such entity.

d.   All matters relating to any claim or legal action which I may possess against any other person or entity, or which any other person or entity may possess against me, including the settlement or the abandonment thereof.

e.   All matters relating to my personal affairs and relationships, except the right to change or destroy my Last Will and Testament, any Revocable Trust of which I am the Grantor, or any Living Will unless permitted by the terms of such Living Will.

f.   All matters relating to my personal health and care, including but not limited to authorization for medical examinations, care, and treatment, private nursing care, and commitment to rehabilitation, long term care, and nursing care facilities; provided, however, in the event of any conflict between this Instrument and any Declaration of a Desire for a Natural Death or South Carolina Health Care Power of Attorney which I have executed or hereafter shall execute, the provisions and authority granted by the Declaration of a Desire for a Natural Death and/or the South Carolina Health Care Power of Attorney shall prevail.

1

BEAUFORT COUNTY SC- ROD
BK 01977 PGS 0727-0734
DATE: 06/24/2004  09:53:38 AM
INST # 2004042176  RCPT# 253683